**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **SERVICE EMPLOYEES INTERNATIONAL** | § | **CASE NO. 16-20483** |
| **UNION – TEXAS** | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

**EXPEDITED MOTION OF PROFESSIONAL JANITORIAL SERVICE OF HOUSTON,**
**INC. TO DISMISS OR, IN THE ALTENATIVE, CONVERT CASE**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EXPEDITED RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EXPEDITED BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT EXPEDITED CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**To the Honorable David R. Jones,**
**Chief United States Bankruptcy Judge:**

Professional Janitorial Service of Houston, Inc. ("PJS") files this Expedited Motion to

Dismiss or, in the Alternative, Convert Case (the "Motion") pursuant to 11 U.S.C. §§ 105 and

1112 and Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure.

**Summary**

1.      Service Employees International Union-Texas d/b/a Service Employees International Union Local 5 ("<u>SEIU Texas</u>") filed a "shot gun" chapter 11 petition for the sole purpose of protecting the economic interests of its alter ego, Service Employees International Union ("<u>SEIU International</u>" and collectively with SEIU Texas, "<u>SEIU</u>").  SEIU Texas has no legitimate reason to be in chapter 11 other than to delay PJS's rights as a judgment creditor and to protect SEIU International from having to post a supersedeas bond for the benefit of SEIU Texas.  As described in detail in PJS's Supplemental Response to Defendant's Motion to Set Bond, attached hereto as **<u>Exhibit 1</u>**, SEIU International funded and controlled every aspect of the litigation between PJS and SEIU Texas and unquestionably orchestrated the filing of this chapter 11 case in a bad faith attempt to avoid posting a $6 million bond.

2.      Unfortunately for SEIU Texas and SEIU International, as evidenced by their representations to the state court in the Motion to Set Bond, attached hereto as **<u>Exhibit 2</u>**, they have unwittingly painted themselves into a corner by filing this case.  Specifically, SEIU Texas has admitted that it cannot operate without significant financial support from SEIU International, which was true even before PJS obtained its judgment.  SEIU International's funding of SEIU Texas expires on December 31, 2016. SEIU Texas asserts in the Motion to Set Bond that SEIU International has not agreed to provide any funds to SEIU Texas in 2017 in light of the judgment and SEIU Texas has no expectation that SEIU International will provide such funding.  If this is true, this case must be dismissed or converted because there can be no reasonable likelihood of rehabilitation without ongoing financial support of SEIU International.[1]  On the other hand, if the parties are simply posturing to avoid having to post an appropriate bond and SEIU International

---

[1] Notably, this chapter 11 case is now six days old and SEIU Texas has yet to file schedules, statements of financial affairs or a single "first day" motion to allow its continued post-petition business operations.

intends to continue providing funds necessary to SEIU Texas's operations, then the case should be dismissed because SEIU International has more than sufficient assets to bond the full amount of the judgment.   Under either scenario, the Court should dismiss this case as a bad faith filing and allow the state court to rule on the Motion to Set Bond.

### Request for Expedited Consideration

3.      PJS requests the Court consider this Motion on an expedited basis.  A hearing on SEIU Texas's Motion to Set Bond was originally scheduled for December 8, 2016.  In light of the filing of this bankruptcy case, that hearing has been continued until December 15, 2016.  PJS seeks expedited relief from this Court so that the state court judge who oversaw the trial and already heard the relevant testimony may adjudicate SEIU Texas's Motion to Set Bond.

4.      The judge who presided over the trial is leaving the bench on December 31, 2016. The timing of SEIU Texas's Chapter 11 petition is guileful and reflects an attempt to abuse the changing of the guards at the trial court. Specifically, delaying the bond-setting hearing allows SEIU to avoid the trial court judge who is familiar with the case. The primary benefits to SEIU of avoiding the trial judge are twofold. First, under Texas law, the trial court is "the sole judge of the credibility of the witnesses and the weight to be given their testimony" when analyzing evidence related to the setting of a supersedeas bond. *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 841 (Tex. App.—Dallas 2006, no pet.). After spending a month in trial, SEIU knows how lacking in credibility its witnesses and evidence are in the eyes of the trial court. For example, one of SEIU's trial attorneys had to be reprimanded for making hand signals to coach the union's trial witnesses, and a union witness (who is also an attorney) had to be sanctioned for repeatedly violating the court's motion in limine. *See* **Exhibit 3**.[2] Accordingly, SEIU calculates that it may

---

[2] The transcript reflecting the reprimand for hand signals has been ordered and should be available by the time of the hearing on this Motion.

have a better chance on its bond-setting arguments with a judge-elect who has not yet had to confront SEIU's litigation tactics and its witnesses' lack of credibility.

5.      Second, getting before a new trial judge enables SEIU to drag out the trial court proceedings even further. A consistent strategy throughout the past nine years has been for SEIU to extend the dispute and drive up costs, hoping that PJS will succumb to litigation fatigue. For example, SEIU repeated the same unsuccessful jurisdictional arguments to three consecutive district court judges and in appellate briefing over the course of at least twelve separate filings, including: pleas to the jurisdiction, motions for summary judgment, an interlocutory appeal, a motion for judgment as a matter of law, a motion for directed verdict, and a motion for JNOV or new trial. This is not merely a conclusion that PJS has drawn; SEIU's campaign manual reveals that SEIU purposely uses "legal pressure" on employers such as PJS for the purpose of exposing employers to "[e]xtra expense" and "[c]ostly delays." *See* **Exhibit 4** at 12558. Delaying the bond setting until after this month permits SEIU to repeat its meritless arguments to a judge unfamiliar with the past decade of this dispute and forces PJS to respond, rather move on to the appeal.

6.      SEIUs' judge shopping is as blatant as could be. In an email giving the union's "honest take" on the verdict at trial, an SEIU International official instructed subordinates to publicly blame the verdict on the trial judge, calling the jury's decision "the work of a partisan Abbott" appointee. *See* **Exhibit 5**. Now, SEIU Texas is abusing these bankruptcy proceedings in effort to make sure that the trial judge it is publicly impugning does not have an opportunity to rule on the supersedeas-bond motion that has now been pending before that judge since October.

7.      PJS asks the Court to rule on its motion to dismiss on an expedited basis to prevent SEIU from achieving its transparent judge-shopping and delay tactics. **The fact is that SEIU will obtain the sought-after litigation advantage even if it is able to delay a dismissal**

of this action by a few weeks **(until after the current trial judge leaves the bench on December 31).** If the current trial court judge does not consider PJS's alter-ego arguments related to setting a supersedeas bond before the end of the year, the result will be an enormous waste of judicial resources and an unfair litigation advantage to SEIU. As a result, anything other than an expedited ruling on this Motion to Dismiss would result in SEIU Texas achieving the unfair advantage that it seeks even if this Court were to determine, at a later date, that SEIU Texas filed for bankruptcy in bad faith. Without immediate relief, there will be no practical remedy for SEIU Texas's bad faith and SEIU will have reaped the fruits of its bad faith. **Accordingly, PJS requests consideration of this Motion on or prior to December 14, 2016.**

<u>**Factual Background**</u>

8.      This bankruptcy arises in response to a business disparagement suit by PJS, a Houston janitorial contractor, against SEIU Texas, which is a subsidiary union created, controlled, and almost fully funded by SEIU International, a parent conglomerate that reported $171,707,621 in net assets as of December 31, 2015. *See* <u>**Exhibit 6**</u> (LM-2 Annual Report 2015).

9.      SEIU International wants PJS to agree to become a union contractor. But PJS—consistent with its rights under federal law—has made clear that it only wants to do so if a majority of its employees vote for SEIU in a democratic, NLRB-supervised secret ballot election. PJS's position has not been well-received by SEIU, which believes "the law doesn't work" for it when it comes to elections. So, rather than seek an election, SEIU International designed and, acting through SEIU Texas, carried out a public campaign to attack PJS. The campaign involved falsely telling PJS customers that PJS was forcing janitors to work off the clock and firing or threatening janitors with pro-union political views. SEIU sought "to kill" PJS by bombarding PJS clients (and their clients and tenants) with hundreds of e-mails, faxes, flyers,

letters, reports, newsletters, websites, and oral presentations about PJS. Many of the publications include express requests for the recipients to take action to have PJS removed as the cleaning contractor for certain buildings because of PJS's supposed unlawful behavior.

10.     Even before SEIU began spreading these stories, Department of Labor and NLRB investigations found that SEIU's accusations were not true; PJS was properly paying its workers and not engaging in any retaliation. *See, e.g.*, **Exhibit 7**.  In an internal memo, however, union officials admitted the purpose of SEIU's campaign: "If PJS does not sign with the union, we plan to cause them to lose so much work that they are irrelevant to the market, or to drive them out of the market entirely." **Exhibit 8**.

11.     After a four-week trial, a Houston jury decided that SEIU Texas acted with malice in publishing the false statements against PJS. **Exhibit 9**.  The jury awarded PJS $5,316,869 in damages representing the anticipated profits from the accounts that PJS lost as a result of the union's false statements. The court entered judgment against SEIU Texas for $7,817,254.13, reflecting the verdict amount plus nine years of prejudgment interest and court costs. **Exhibit 10**.

12.     En route to the verdict, SEIU engaged in nine years of delay tactics that have already stretched this litigation over the better part of a decade. First, SEIU removed the lawsuit to federal court, where it was promptly remanded. Three state trial judges will have come and gone from the bench during SEIU's ensuing delays in the state court. All three of those judges denied five attempts to dispose of the claims on labor-law or First-Amendment grounds. SEIU tried an interlocutory appeal to both an intermediate state court and the Texas Supreme Court, meeting with further rejection each time. The trial court also denied SEIU's pretrial motions to dismiss, two motions for directed verdict, and motions for new trial and judgment notwithstanding the verdict. *See*, *e.g.*, **Exhibit 11**.

6

13.     The trial court issued a final judgment on September 26, 2016. Although SEIU could have requested that bond be set at any point after then, SEIU waited until October 31, 2016 to file its motion for setting a bond. SEIU set that motion for hearing on November 4, 2016 and was prepared to have it decided that day. Rather than immediately setting a bond in the amount SEIU requested, however, the trial court ordered limited discovery to determine the alter-ego relationship between SEIU Texas and SEIU International. That discovery revealed a clear-cut alter ego situation, as further explained in Exhibit 1.

14.     Although SEIU Texas was originally prepared to have a bond set and move forward with its appeal in November, it began asking the state court for continuances of the bond hearing after SEIU International's interests became implicated. The trial court declined SEIU Texas's various requests to continue the bond hearing. On December 2, 2016, PJS filed its supplemental brief explaining in detail the alter-ego relationship between SEIU Texas and SEIU International.

15.     Had the state court accepted PJS's arguments, the consequence would have been that SEIU International's assets would be considered in setting the supersedeas bond. *See In re Smith*, 192 S.W.3d 564, 568–69 (Tex. 2006). After being confronted with this evidence on December 2 and having lost its several state-court requests for continuance, SEIU Texas's legal team—which consists of SEIU International staff attorneys along with outside counsel being paid by SEIU International (*see* Exhibit 1)—decided to pursue this bankruptcy proceeding before the state court could, in effect, require SEIU International to contribute toward the supersedeas bond. As one consequence, SEIU Texas has already effectively granted itself the continuance of the bond hearing that the state court repeatedly denied.

**Argument**

**A.      Legal Background**

16.      Section 1112(b) of the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*

(the "Code"), entitles PJS (as a creditor and party in interest) to seek conversion of this case to a

case under Chapter 7 of the Code, or to dismiss the case entirely.  Section 1112(b) provides:

> …[O]n request of a party in interest, and after notice and a hearing, the court shall
> convert a case under this chapter to a case under chapter 7 or dismiss a case under
> this chapter, whichever is in the best interests of creditors and the estate, **for
> cause** unless the court determines that the appointment under section 1104(a) of a
> trustee or an examiner is in the best interest of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added).

17.      Section 1112(b)(4)(A) defines "cause" to include "the absence of a reasonable

likelihood of rehabilitation."

18.      In addition to the statutory grounds for cause, the Fifth Circuit has repeatedly

interpreted "cause" for purposes of § 1112 to include the bad faith filing of a Chapter 11 petition.

*See, e.g., In re Humble Place Joint Venture*, 936 F.2d 814, 816-17 (5th Cir. 1991) (citing *Little

Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek)*, 779 F.2d 1068

(5th Cir. 1986)).  In *Little Creek,* the Fifth Circuit held:

> Requirement of good faith prevents abuse of the bankruptcy process by debtors
> whose overriding motive is to delay creditors without benefitting them in any way
> or to achieve reprehensible purposes.  Moreover, a good faith standard protects
> the jurisdictional integrity of the bankruptcy courts by rendering their powerful
> equitable weapons (i.e., avoidance of liens, discharge of debts, marshalling and
> turnover of assets) available only to those debtors and creditors with "clean
> hands."

779 F. 2d at 1072.

19.      Generally speaking, courts have found good faith lacking in cases evidencing

some, but not all, of the following non-exclusive factors:

1.      the debtor has one asset, such as a tract of undeveloped or developed real property;

2.      the secured creditors' liens encumber this tract;

3.      there are generally no employees except for the principals;

4.      there is little or no cash flow;

5.      there are no available sources of income to sustain a plan of reorganization or to make adequate protection payments;

6.      there are only a few, if any, unsecured creditors whose claims are relatively small;

7.      the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;

8.      bankruptcy offers the only possibility of forestalling loss of the property;

9.      there are sometimes allegations of wrongdoing by the debtor or its principals; and

10.     the case is a "new debtor syndrome" case.

*Id.* at 1072-73.

20.     Without question, "a debtor's attempt to use the provisions of the Bankruptcy Code to gain an unfair advantage in a two party dispute strongly supports a finding of cause" under § 1112. *In re Starmark Clinics, LP*, 388 B.R. 729, 736 (Bankr. S.D.Tex. 2008).

**B.      SEIU Texas clearly has no reasonable likelihood of rehabilitation.**

21.     One of the statutory grounds for cause to dismiss or convert a chapter 11 case is that the debtor has no "reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The debtor's admissions in the Motion to Set Bond establish that it has no reasonable likelihood of rehabilitation. Specifically, SEIU Texas represented to the state court that:

> **SEIU Texas currently operates at a significant operating loss**. Easley Report, pp. 2-3. In recent years, **SEIU Texas has been able to continue in operations in part because it received periodic financial subsidies from [SEIU International]**, a legally separate labor union with which SEI Texas has been

9

affiliated since April 2013.  Easely Report, p. 2; Affidavit of William Dempsey [Tab C], ¶ 31.  However, the agreements under which SEIU Texas has received these subsidies all expire by December 31, 2016, and SEIU [International] has no obligation to provide any additional subsidies.  Easley Report, p. 2; Dempsey affidavit, ¶42.  Thus, while Mr. Easley's assessment of SEIU Texas's net worth and his calculation of SEIU Texas's ability to post a bond without suffering substantial economic harm takes into account the amounts that the International Union is contractually committed to pay SEIU Texas between now and December 31, 2016, his valuation report also recognizes that [SEIU International] has no contractual or other obligation to provide SEIU Texas any financial or other subsidy after December 31, 2016.  Dempsey Affidavit, ¶43.

SEIU Texas understands that if it makes a request for additional subsidies after that date, [SEIU International] will evaluate any such request based on the current circumstances [SEIU Texas] facts, in particular, the $7.8 million judgment in this case, and for that reason **will likely decline to provide such a subsidy**.  *See* Dempsey Affidavit, ¶44 . . .

**SEIU Texas has no expectation that [SEIU International] would conclude, under these circumstances, that it makes any economic sense for [SEIU International] to provide future subsidies to SEIU Texas after December 31, 2016**.  To the contrary, SEIU Texas is fully aware that when other local unions have faced comparable bankruptcy-inducing judgments, the international unions with which those local unions were affiliated made the economically rational decision not to intervene to stave off bankruptcy and subsequent reorganization by the local union . . .

If SEIU Texas maintains its current level of operations, it will cease to be a going concern at some point in the near future.  **Exhibit 12**, (Easley Report, p. 3)

22.    SEIU Texas's expert report notes that "SEIU International has been providing annualized reimbursements and subsidies that have average[d] in excess of $3,000,000 per year since 2013."  **Exhibit 12**, p. 2.[3]  Further, SEIU Texas mischaracterizes its own expert report by suggesting that it will cease to be a going concern at some point in the future.  SEIU Texas's expert actually opined that, even assuming a 40% reduction in workforce, SEIU Texas would operate at more than a $2 million annualized deficit without subsidies from SEIU International

---

[3] The Easley Report is attached as an exhibit to the Motion to Set Bond.

and that "SEIU Texas is not a going concern at its present level of operations." *Id*. at p. 3.[4]  This expert conclusion is consistent with the deposition testimony of the president of SEIU Texas who stated that it cannot now—and never was able to—operate or even meet its payroll without subsidies from SEIU International.  *See* **Exhibit 13** at 119:15-121:13.

23.    SEIU Texas has represented to the state court through its Motion to Set Bond that (a) it is not a going concern absent significant subsidies from SEIU International, (b) it has only been able to continue operations since 2013 because of these subsidies, (c) these subsidies will end on December 31, 2016, and (d) SEIU International will not provide any future subsidies. Based on these representations alone, SEIU Texas has no reasonable likelihood of rehabilitation and this case should be dismissed.

24.    Moreover, any attempt by SEIU Texas to backtrack from its unequivocal allegations in the Motion to Set Bond can likewise only be interpreted as supporting dismissal of this case.   Namely, if SEIU Texas now tries to assert that it can successfully reorganize based on SEIU International's new found renewal of subsidies, the Court must conclude that the filing of this chapter 11 case is a sham and was done for no purpose other than to protect SEIU International from having to contribute toward a supersedeas bond in state court if that court had found an alter-ego relationship to exist.  Notably, SEIU International claims to have hundreds of millions of dollars in assets and an $80 million line of credit so there is *no doubt that SEIU International has the ability to bond for the full judgment amount* if it wants to prop up SEIU Texas as an "operating entity."

---

[4] The financial reports summarized in the report show that for 2014, 2015 and the first nine months of 2016, subsidies from SEIU International were between 80% and 83% of SEIU Texas's gross revenue (e.g., in 2015 SEIU Texas collected $793,130 in dues and fees from its members and received a total of $3,841,778 from SEIU International).

25.     In summary, SEIU Texas and SEIU International cannot have it both ways.  Either SEIU Texas is not a going concern because it no longer has the economic support of SEIU International or it has the support of SEIU International and has no legitimate reason to be in chapter 11.  For these reasons alone, this case should be dismissed.

**C.     SEIU Texas's case was filed in bad faith.**

26.     In addition to the statutory grounds for dismissal, this case should be dismissed for being filed in bad faith.  The *Little Creek* factors clearly weigh in favor of such a finding.

27.     First, as discussed above, SEIU Texas has little to no cash flow aside from SEIU International subsidies, and there are no other available sources of income to sustain a plan of reorganization.   According to SEIU Texas's own admissions, it cannot survive without supplemental income from SEIU International and it would be economically irrational for SEIU International to continue providing such support.  Moreover, given its limited revenue stream from members compared to its annual operating budget and inability to increase revenue from other sources, it is impossible to see any financial institution providing a DIP loan to SEIU Texas.  Presumably, this is the very reason SEIU Texas has not filed a single "first day" motion requesting authority to continue operating in accordance with its prepetition practice, paying wages, maintaining bank accounts, etc.  Accordingly, these two factors weigh in favor of a finding of bad faith.

28.     Second, there are only a few unsecured creditors whose claims are relatively small.  Although it has not filed schedules, SEIU Texas filed its list of the 20 largest unsecured creditors (Doc. No. 2).  Excluding PJS and a SEIU-related creditor, the remaining 18 largest unsecured creditors are owed a total of $62,769.39.[5]  The twentieth largest unsecured creditor is

---

[5] In the Motion to Set Bond, SEIU Texas requests the state court set the supersedeas bond at $100,000 which is admits it has the ability to pay.

only owed $182.50, and 16 of the 20 unsecured creditors are owed less than $3,000.00 each.  It is clear that SEIU Texas has only a few unsecured creditors whose claims are relatively small and this case was filed solely to avoid bonding for PJS's judgment.  Accordingly, this factor weighs in favor of a finding of bad faith.

29.     Third, the debtor and one creditor have proceeded to a stand-still in state court litigation even after the debtor has already ended up on the losing end of a final judgment.  The final issue remaining for the state court was to decide the appropriate supersedeas bond. Far from being bankrupted because the trial court set a bond that was too high, SEIU Texas did not even wait to see what amount the court would impose. Neither party knows how the state court will rule.  After seeing from PJS's Supplemental Response to the Motion to Set Bond that its parent union was likely to be implicated, however, SEIU Texas filed this case less than 48 hours before the state court was due to set a bond and make an alter-ego finding.  This preemptive filing is further evidence of bad faith because it shows that the timing of this filing was controlled by and for the benefit of SEIU International, which unquestionably has the ability to post a supersedeas bond in the full amount of the judgment.  *See In re 15375 Memorial Corp*., 589 F.3d 605, 609, 624-25 (3d Cir. 2009) (finding that bankruptcy cases were filed in bad faith because (i) it was a litigation tactic out of a "fear" of alter ego liability against the debtor's parent company, (ii) the primary concern of the debtor was protecting its parent companies, not itself, and (iii) the debtor's decision to file for bankruptcy was ultimately controlled by the parent entities).[6] Accordingly, this factor weighs in favor of a finding of bad faith.

---

[6] In the event that SEIU Texas prevailed on its Motion to Set Bond, there would have been no reason to file bankruptcy because SEIU Texas was requesting, and admitted the ability to post, a $100,000 bond. Thus, regardless of how the Motion to Set Bond was decided, the timing of this case indicates bad faith. *See In re Surgical Associates*, 2013 Bankr. LEXIS 1070, at *12 ("[A]n abuse of the bankruptcy process has been found where a judgment debtor has the financial ability to post a bond, but chooses to thwart a judgment creditor's collection action by filing bankruptcy instead.").

30.     Fourth, this case and PJS's judgment arise out of serious wrongdoing by both SEIU Texas and SEIU International.  Specifically, SEIU International controlled and directed a sustained campaign by SEIU Texas to disparage and harm PJS contractual relationships.  In order to find liability, the jury had to find SEIU Texas guilty of actual malice—the spreading of false stories that SEIU Texas knew were false or at least doubted were true.  As the "source documents" for its stories about PJS, SEIU Texas relied on statements forged by its own employees.  Trial testimony from former janitors established that many of the workers SEIU said were being abused in fact experienced none of the problems that SEIU claimed and had never even spoken to SEIU officials despite SEIU documents falsely asserting those workers had been interviewed.[7] The wrongful acts of the SEIU Texas, SEIU International and their agents resulted in the judgment and, therefore, those actions are the root cause of this bankruptcy case. Accordingly, this factor weighs in favor of a bad faith finding.

31.     Finally, there is a long line of cases holding that it is improper for a bankruptcy filing to be used as leverage in what amounts to essentially a two-party dispute.  *See, e.g., In re Kickapoo Kennels, LLC*, 2013 Bankr. LEXIS 2499, at *4 (Bankr. S.D. Tex. June 19, 2013) ("This court has generally found cause to dismiss cases in which it appeared that the debtor was attempting to use the provisions of the Bankruptcy Code to gain an unfair advantage in a two-party dispute.") (collecting cases). Specifically, a litigant's attempt to use bankruptcy proceedings as an end-run around state court supersedeas procedures is a classic indicator of bad faith.  *See In re Sherwood Enterprises, Inc.*, 112 B.R. 165, 169 (Bankr. S.D. Tex. 1989) (dismissing a case for bad faith because it was filed to avoid having post a supersedeas bond in what was essentially a two-party dispute); *In re Ravick Corp.*, 106 B.R. 834, 845 (Bankr. D.N.J.

---

[7] These facts are established by the trial testimony of Miriam Reyes and Gerardo Silva, whose transcripts PJS has ordered for presentation to this Court.

1989) ("The debtor filed its petition herein to avoid the consequences of adverse state court decisions while it continues litigating. This court should not, and will not, act as a substitute for a supersedeas bond of state court proceedings.").

32.     There can be no doubt that SEIU Texas has filed this case in response to the PJS verdict and for the particular purpose of avoiding Texas bond rules. In a recent statement to the media about its bankruptcy petition, the president of SEIU Texas specifically broadcasted that those were the union's reasons for seeking relief in this Court:

> SEIU Texas took this action after a lawsuit brought by Professional Janitorial Services (PJS) and a series of court rulings resulted in a judgment against the SEIU Local for millions of dollars. . . . SEIU is appealing the judgment and is confident of victory. The company, PJS, has been trying to block our right to appeal, arguing that the SEIU Local should be forced to post an $8 million [*sic*] bond in order to appeal. . . . **Bankruptcy** is a common process provided under the law to protect organizations—such as corporations, non-profits, unions etc.—and **allows us to seek temporary relief from our debt while we continue to pursue our appeal of an unfair judgment**.

**Exhibit 14**. Even according to SEIU's own public admissions, there is no question that this bankruptcy amounts to nothing more than a two-party dispute filed for the improper purpose of using the automatic stay to avoid the setting of a bond and to shield the assets of non-debtor SEIU International.  *See In re 15375 Memorial Corp.*, 589 F.3d at 609.  Accordingly, the two-party nature of this case and the clear attempt to avoid ordinary supersedeas bond procedures weighs in favor of a bad faith finding.

33.     In sum, several of the *Little Creek* factors are present here and the totality of the circumstances—lack of cash flow and funding to reorganize, absence of other unsecured creditors with substantial claims, the timing of the filing in connection with the Motion to Set Bond, the wrongful acts of the debtor and its principals, and the two party nature of this dispute—warrants a finding that this case was filed in bad faith.

WHEREFORE, PJS respectfully requests that this Court enter an order dismissing this case or, in the alternative, converting this case to a case under chapter 7 and for such other and further relief as is just.

Dated: December 9, 2016.

Respectfully submitted,

By:    <u>/s/ Joshua W. Wolfshohl</u>
Joshua W. Wolfshohl
State Bar No. 24038592
Aaron J. Power
State Bar No. 24058058
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000
(713) 228-1331 (fax)

**Counsel for Professional Janitorial Service of Houston, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that this instrument was served by electronic mail service to counsel for the debtors (bhugon@mckoolsmith.com) and by electronic transmission to all registered ECF users appearing in the case on December 9, 2016.

<u>/s/ Aaron J. Power</u>
Aaron J. Power